# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DAWN GEORGETTE MYERS,**

**Plaintiff,**

**-vs-**                                                    **Case No.  6:04-cv-1542-Orl-28DAB**

**CENTRAL FLORIDA INVESTMENTS,
INC., CFI SALES AND MARKETING,
LTD., WESTGATE RESORTS, INC.,
WESTGATE RESORTS, LTD., and
DAVID SIEGEL,**

**Defendants.**
_____

## ORDER

Plaintiff's claims of sexual harassment under the Florida Civil Rights Act ("FCRA") and

Title VII of the Civil Rights Act of 1964, as well as her claim of battery under Florida law,

were tried to a jury over a six-day period in February 2008.  On the sexual harassment

claims, the jury returned a verdict finding that Plaintiff had been subjected to harassment but

that none of the acts of sexual harassment occurred on or after September 15, 2000—within

the 365 days prior to the filing of her administrative charge, as required for her claims to be

timely under the administrative scheme.  Because of this finding of untimeliness, the jury did

not reach the issue of damages on the sexual harassment claims.

On the battery claim, the jury returned a verdict for Plaintiff, finding that Defendant

David Siegel did commit battery against Plaintiff and that conduct constituting battery

occurred on or after May 21, 2000—within the four years prior to the filing of the battery

claim and thus within Florida's four-year statute of limitations for such a claim.  The jury awarded compensatory damages of $102,223.14 on the battery claim, as well as $5,276,640.00 in punitive damages.  Judgment for Plaintiff was entered in these amounts on February 29, 2008.  (Doc. 241).

Pursuant to Federal Rule of Civil Procedure 62(b) and agreement of the parties, enforcement of the judgment and of the bill of costs has been stayed, without bond, until ten days after disposition of the parties' post-trial motions.[1]  (Order, Doc. 264).  These post-trial motions, which are numerous, are now before the Court for disposition.

I.  Motions Filed by Plaintiff

A.  Plaintiff's Renewed Motion for Judgment as a Matter of Law (Doc. 257)

Plaintiff's Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50 on Statute of Limitations (Doc. 257) pertains to Plaintiff's sexual harassment (hostile work environment) claims under Title VII and the FCRA.  The jury found that Plaintiff was subjected to a hostile or abusive work environment but that none of the acts of sexual harassment took place on or after September 15, 2000—within 365 days before the filing of her EEOC charge—barring relief on these statutory claims.

Plaintiff argues that the timeliness issue, which she describes as a "statute of

---

[1]In light of Plaintiff's agreement not to require a bond (see Doc. 249) and the entry of the Order (Doc. 264) staying the judgment until after disposition of post-trial motions, Defendants' Unopposed Motion to Seal (Doc. 245) documents containing financial information was rendered moot and will be denied as such in this Order.  Plaintiff's latest motion pertaining to the requirement of a bond (Doc. 285) will be denied without prejudice in light of the other rulings in this Order, rendering Defendants' second Unopposed Motion to Seal (Doc. 286) moot.

limitations," was an affirmative defense on which Defendants bore the burden of proof.  She contends that the Court erred in instructing the jury as to the timeliness issue after allegedly precluding her from addressing the issue in her rebuttal case.  She requests that "the affirmative defense of the statute of limitations" be stricken; that the jury's finding of this defense be nullified; that she be awarded nominal damages based on the jury's finding of liability on the hostile environment claim; and that she be found to be entitled to attorney's fees under Title VII and the FCRA.  Defendants maintain that the timeliness issue is a condition precedent on which Plaintiff bore the burden and that Defendants were not obligated to present any evidence as to timeliness when Plaintiff did not establish timeliness in her case-in-chief.

Plaintiff's contentions in this motion are without merit.  Plaintiff is incorrect in characterizing the timing of the hostile work environment events as a "statute of limitations issue"; she was not precluded from presenting evidence regarding the timing of events; and the question of when the events at issue occurred was plainly one of fact for the jury's resolution.

The timeliness of the sexual harassment claims is not a true "statute of limitations" issue on a which Defendants bore the burden of proof.  In Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982), the Supreme Court held "that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."  The Supreme Court later stated in that opinion that the legislative history of Title VII "indicates that Congress intended the filing period to operate as a statute of limitations

instead of a jurisdictional requirement." Id. at 394.  However, the Supreme Court did so not in the context of allocating burdens of proof but rather in determining whether the untimeliness of a claim would deprive a court of jurisdiction over the claim.

It is clear that in this circuit, the plaintiff bears the burden of proof on the issue of timely administrative filing, a condition precedent to suit.  In Jackson v. Seaboard Coast Line Railroad Co., 678 F.2d 992 (11th Cir. 1982), the Eleventh Circuit Court of Appeals explained, in discussing Title VII's presuit requirements, that pursuant to Federal Rule of Civil Procedure 9(c), a plaintiff must allege in his complaint that he has fulfilled all conditions precedent, and if the defendant disagrees, the defendant may deny such satisfaction of preconditions.  Id. at 1010.  If the defendant does so, "[t]he plaintiff then bears the burden of proving that the conditions precedent, which the defendant has specifically joined in issue, have been satisfied."  Id.; see also Mahgoub v. Miami Dade Cmty. Coll., No. 05-11520, 2006 WL 952278, at *1 (11th Cir. Apr. 13, 2006) ("Plaintiff has not carried his burden of showing that at least one incident occurred within 300 days of his 29 April 2003 EEOC filing."); Rizo v. Ala. Dep't of Human Res., 228 F. App'x 832,  836 (11th Cir. 2007) ("Generally, the plaintiff must allege in the complaint filed in his lawsuit that he has met the prerequisites o[f] a valid and timely-filed EEOC charge.  If the defendant denies that the plaintiff ha[s] met those requirements, the burden of proof is on the plaintiff to prove that he has.") (citation omitted). But see Salas v. Wisc. Dep't of Corr., 493 F.3d 913, 922 (7th Cir. 2007) (holding that "[a] plaintiff's failure to exhaust administrative remedies is an affirmative defense, which is the defendant's burden to prove").

In this case, Defendants alleged failure to timely file at their first opportunity and

maintained that position throughout the case, through trial, plainly putting timely filing at issue and placing the burden on Plaintiff.  Plaintiff pled fulfillment of conditions precedent (see Second Am. Compl., Doc. 47, ¶ 9), and Defendants responded that "Plaintiff did not exercise her right to sue or to file her EEOC Complaint within the time prescribed by the statute" (Defs.' Answer & Affirmative Defenses to Pl.'s Second Am. Compl., Doc. 85, at 32). Defendants then filed a motion to dismiss (Doc. 54) and untimeliness was among their arguments; that motion was denied because Plaintiff had alleged that some events occurred as late as Thanksgiving 2000.  (See Docs. 63 & 76).  Defendants raised the issue again in their summary judgment motion (Doc. 93), but because there was evidence presented at the summary judgment stage depicting events occurring around Thanksgiving 2000, which had to be accepted as true for summary judgment purposes; that motion also was denied with regard to this issue (Order, Doc. 143, at 29).

The issue of the timeliness of the filing of Plaintiff's administrative charge was plainly a factual matter for the jury, as was the question of whether Plaintiff's state law battery claim was timely under Florida's four-year statute of limitations—a "true" statute-of-limitations issue on which Defendants bore the burden of proof.[2] See, e.g., Ramos v. Philip Morris Cos., 743 So. 2d 24, 30 (Fla. 3d DCA 1999) ("[T]he statute of limitations is an affirmative defense which must be plead and proved by the defendant.").  The jury resolved the latter issue in Plaintiff's

_____

[2]The timeliness issues regarding the sexual harassment claims and the battery claim were at times argued simultaneously by counsel, resulting in some confusion and overlap of the labels "statute of limitations" and "condition precedent."  It is clear, however, that the jury found for Defendants on the issue (timely administrative filing) on which Plaintiff bore the burden of proof and for Plaintiff on the issue (battery within the statute of limitations) on which Defendants bore the burden of proof.

favor, and Plaintiff has not raised a post-trial challenge to the submission of the battery statute-of-limitations issue to the jury.

This case involved vastly disparate testimony from the parties' witnesses—a classic "he said, she said" case where the jury was compelled to choose which side it found credible.  The questioning of the witnesses throughout the trial pertained to what happened (or did not happen) and when.  After Plaintiff rested her case-in-chief, Defendants made an *ore tenus* Rule 50 motion on the issue of whether any of the events described by Plaintiff occurred within the 300 days[3] prior to the filing of her administrative charge.  (Trial Tr. Feb. 14, 2008, Doc. 240, at 59-66).  The Court reserved ruling on the motion (id. at 66), and the trial continued with the Defendants' presentation of their case.  After the Defendants rested, Plaintiff made a "partial Rule 50 motion," in part with regard to this issue as to timeliness. (Trial Tr. Feb. 19, 2008, Doc. 242, at 133).  Plaintiff argued that "[t]he defense has rested without raising anything in support of its affirmative defense of a lack of activity within the statute of limitations time period." (Id. at 133-34).  Plaintiff continued that "the defendant pled the statute of limitations, but they rested their case before they put on the first thing to shift the burden back to the plaintiff on that issue." (Id. at 134).  Plaintiff argued that she had "put on evidence of incidents well up into the period, and . . . that [the Defendants] have not met their burden to even properly raise it for consideration." (Id. at 135).

Defendants responded by arguing that it was plaintiff's burden of proof as to when the

---

[3]Later, Defendants agreed that the operative time period is 365 days rather than 300 days.  (See Trial Tr. Feb. 20, 2008, Doc. 243, at 8 & 12).  During most of the trial, however, Defendants argued (outside the presence of the jury) for a 300-day limitation.  (See, e.g., Trial Tr. Feb. 14, 2008, Doc. 240, at 60-61, 64).

act(s) supporting her battery claim occurred and as to whether she had "instituted the administrative process [i]n a timely fashion" with regard to her Title VII claim.  (Id. at 138). Defendants argued that Plaintiff was improperly trying to put the burden on Defendants to "prove a negative" because it was Defendants' theory that none of the events of harassment occurred at any time. (Id. at 139). Defendants further argued that Plaintiff had not presented any evidence as to events happening within the requisite time period toward the end of her employment. (Id. at 139-40).  Defendant, still relying on a 300-day period instead of a 365-day period at this point in the trial, again asserted that Plaintiff had to show events happening in November or December 2000 in order for the Title VII claim to be timely.  (Id. at 142). Defendants also argued that in any event they had shown untimeliness through Mr. Siegel's testimony.  (Id. at 143).  The Court reserved ruling on the "statute of limitations argument." (Id. at 152).

Plaintiff then began her rebuttal case, with Plaintiff testifying once again.  (Id. at 152-53).  Plaintiff's counsel questioned Plaintiff about when the events that another witness, Kelly Oehrle, had testified about had occurred.  (Id. at 157).  After defense counsel made an objection that was sustained on hearsay grounds, Plaintiff testified without objection that the first incident that Ms. Oehrle witnessed occurred "a couple of months after [Ms. Oehrle] had already worked there, and the second time was right before she left" in October or November 2000.  (Id. at 157-158).[4]   The rest of Plaintiff's "rebuttal testimony" pertained to

_____

[4]Immediately after this testimony, the following exchange occurred:

> Q.  She saw an incident in July and an incident in November, December, correct?

other issues.  (See id. at 159-64).

During the charge conference held at the conclusion of the trial testimony, the parties again sparred over whether the issue with regard to the timeliness of both the battery claim and the sexual harassment claims should be submitted to the jury.  (Trial Tr. Feb. 20, 2008, Doc. 243, at 5-12).  Plaintiff's counsel asserted that he "wanted to tighten up the statute of limitations problem in rebuttal" but "was not allowed to because it wasn't responsive to anything that happened in the defense."  (Id. at 6).  Plaintiff's counsel also asserted that he

---

A.  Yes, sir.
Mr. Mitnik [defense counsel]:  Leading.
The Court:  Sustained.
Mr. Mitnik:  Move to strike.
The Court:  Ladies and gentlemen, disregard the last question and answer.
Q.  When did she see the incidents?
Mr. Mitnik:  Objection.  May we approach?
The Court:  Yes, you may.
(BENCH CONFERENCE ON THE RECORD.)
The Court:  First, the objection is sustained.  This is an opportunity to put on rebuttal testimony and asking a witness when another person happened to see something isn't rebuttal.
Mr. Johnson [Plaintiff's counsel]:  Okay.  What about when did it happen, this event that he denied?
The Court:  It's to rebut the testimony of somebody else, it's not to redo your case in chief.
Mr. Johnson:  Well, doesn't it make it more credible to be able to place it in more detail in time and place than previously?
The Court:  Well, but that may be helpful in the case in chief, but in rebuttal you're pretty much limited to just having pure rebuttal testimony.  That's the purpose of it.  It's not to rehash what was done in the case in chief.  So just try to stick with rebuttal.
(END OF BENCH CONFERENCE.)

(Id. at 158-59).

has "never seen that in a jury instruction."  (Id.).

The Court included the issue of timing in the jury instructions as to both the battery claim and the sexual harassment claims, and the verdict form asked the jury whether events constituting battery and sexual harassment occurred on or after the respective pertinent dates for these claims.  (See Jury Instructions, Doc. 232, at 15-16 & 21-22; Verdict, Doc. 233, at 2-3).  The assertion by Plaintiff's counsel that such issues are never included in jury instructions is not well-founded.  Where there is an issue as to whether an act occurred at a certain time so as to render a claim timely under an administrative scheme or a statute of limitations, the issue is one of fact for a jury, and courts instruct juries accordingly.  See, e.g., Weaver v. African Methodist Episcopal Church, 54 S.W.3d 575, 587 (Mo. Ct. App. 2001) (holding that "the issue of whether the battery occurred more than two years before the date of filing was one of fact for resolution by the jury" under the circumstances of the case); see also, e.g., Fla. Std. Jury Instructions in Civil Cases 3.8(g) & Verdict Form 8.9 (including special interrogatory for jury to determine statute-of-limitations compliance in medical malpractice cases).

In sum, the issue of whether events occurred in late 2000 that would render the filing of Plaintiff's administrative charge timely was manifestly a factual one for the jury to resolve.  Accordingly, the Court did not grant either side's Rule 50 motion during trial and submitted the issues of timeliness as to both battery and sexual harassment to the jury.  The Court did not preclude anyone from presenting evidence pertaining to the time that events occurred, and abundant evidence was presented regarding when things happened or did not happen.  Plaintiff is not entitled to judgment as a matter of law on this issue, and her motion (Doc.

257) is thus denied.

### B.  Plaintiff's Motion for Remand of Certain State Claims (Doc. 280)

In this motion, Plaintiff seeks remand of some of her state law claims to the Florida circuit court from which this case was removed.  These claims, set forth in Plaintiff's First Amended Complaint (Doc. 17), alleged:  abuse of process (Count I); slander (Count VIII); malicious prosecution (Count IX); conspiracy (Count X); and contractual attorney's fees (Count XI).  On April 20, 2005, this Court, in ruling on Defendants' motions to dismiss (Docs. 22-24), declined to exercise supplemental jurisdiction over these state law claims because they were unrelated to Plaintiff's employment discrimination claims and there was a risk that they would predominate.  (See Order, Doc. 46).  The Court dismissed these five state law claims.  (See id. at 7).  Plaintiff was then given leave to amend her complaint; she filed her Second Amended Complaint (Doc. 47) one week later, and the case proceeded with regard to the counts set forth in the Second Amended Complaint.

Plaintiff now seeks to revive the five dismissed state law claims, arguing that the Court should have *remanded* them to state court in April 2005 instead of *dismissing* them. However, the case authority Plaintiff cites does not support this argument.  Moreover, Plaintiff has waited far too long in seeking this relief.  Plaintiff did not bring this alleged error to the Court's attention in April 2005 when it occurred, nor did Plaintiff seek this relief after entry of the first judgment in this case (Doc. 144) in April 2006.

Somewhat astoundingly, Plaintiff now contends that "[n]o appeal has yet been docketed in this case" (see Doc. 280 at 2), attempting to invoke Federal Rule of Civil Procedure 60(a)'s "before an appeal has been docketed" time limit for motions to correct

"clerical mistakes."  However, judgment in favor of Defendants was first entered in April 2006 pursuant to the granting of Defendants' summary judgment motion, and Plaintiff's then-remaining state law claims for battery and false imprisonment were remanded to state court at that time.  (See Docs. 143 & 144).  In May 2006, Plaintiff sought reconsideration of the summary judgment ruling but did not raise any issue about the 2004 state law claim dismissals.  (See Doc. 146).  Plaintiff then appealed the April 2006 judgment (see Doc. 161), and in August 2007 the Eleventh Circuit Court of Appeals issued its mandate affirming in part, reversing in part, and remanding the case to this Court for further proceedings.  (See Doc. 170).  Pursuant to that mandate, the case proceeded to trial in February 2008 on Plaintiff's claims of battery and sexual harassment[5]—the trial that precipitated the instant flurry of post-trial motions.  Plaintiff cannot now challenge as error the April 2004 dismissal of her other state law claims.  Indeed, the Court doubts it even has the power to "remand" claims that it dismissed more than three years ago.  Plaintiff's motion for remand of these claims is denied.

C.  Plaintiff's Motion to Establish Entitlement to Fees (Doc. 258)

Shortly after the jury returned its verdicts, Plaintiff moved, with consent of Defendants, for bifurcation of the issues of entitlement to attorney's fees and amount of attorney's fees, noting that under Rule 4.18 of the Local Rules of this Court, a motion as to both issues

---

[5]During the pretrial conference on January 31, 2008, the parties agreed that the false imprisonment and battery claims were properly before this Court for trial despite having been remanded to state court in April 2006 and that the only claims for trial were the sexual harassment claims and the battery claim.  Plaintiff voluntarily dismissed her false imprisonment claim prior to trial.  (See Doc. 216).

usually must be filed within fourteen days of entry of judgment.  (See Doc. 244).  The magistrate judge granted the motion to bifurcate (see Order, Doc. 248), and Plaintiff has since filed her Motion to Establish Entitlement to Fees Under Title VII and Florida Civil Rights Act (Doc. 258).

In this motion, Plaintiff claims entitlement to prevailing-party attorney's fees under Title VII and the FCRA.  Title VII's attorney's fee provision states that "[i]n any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee (including expert fees) as part of the costs."  42 U.S.C. § 2000e-5(k).[6]  Plaintiff claims that she is a "prevailing party" if her Rule 50 motion is granted and that she also is a "prevailing party" if her Rule 50 motion is not granted.  The Court has already, within this Order, denied Plaintiff's Rule 50 motion, so the only potential basis for fees is that Plaintiff is a "prevailing party" under Title VII even with that motion having been denied.

Plaintiff begins this portion of her argument by acknowledging that "[t]he verdict in the instant case presents some issues in determining whether Plaintiff is a prevailing party." (Doc. 258 at 5).  Plaintiff asserts that she "won liability on the statutory claims but was barred from winning damages by the statute of limitations finding."  Id.  She nevertheless claims "prevailing party" status.  The Court disagrees.

---

[6]The FCRA's attorney's fee provision states:  "In any action or proceeding under this subsection, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs.  It is the intent of the Legislature that this provision for attorney's fees be interpreted in a manner consistent with federal case law involving a Title VII action." § 760.11(5), Fla. Stat.  Thus, the analysis in the text of the issue of entitlement to fees under Title VII applies equally to the matter of entitlement to fees under the FCRA.

In <u>Walker v. Anderson Electrical Contractors</u>, 944 F.2d 841 (11th Cir. 1991), the Eleventh Circuit noted the "prevailing party" standard established by the Supreme Court: "'If the plaintiff has succeeded on "any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit," the plaintiff has crossed the threshold to a fee award of some kind . . . . The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute.'" <u>Id.</u> at 846 (quoting <u>Tex. Teachers Ass'n v. Garland Indep. Sch. Dist.</u>, 489 U.S. 782, 791-93 (1989) (alterations in original). The jury in <u>Walker</u> found that the plaintiff was sexually harassed but that she sustained no monetary damages as a result. The appellate court affirmed the district court's denial of fees, holding that a jury's finding of sexual harassment, "without more, will not ordain a litigant the prevailing party" because such a finding does not alter the legal relationship between the parties as required by the <u>Garland</u> standard. <u>Id.</u> at 847. The court explained that the plaintiff's "only claim to the spoils of victory is a jury finding of sexual harassment. 'That is not the stuff of which legal victories are made.' Therefore, . . . we hold that to be a prevailing party for purposes of 42 U.S.C. § 2000e-5(k)[] requires the attainment of something more tangible than a jury finding of sexual harassment." <u>Id.</u> (quoting <u>Hewitt v. Helms</u>, 482 U.S. 755, 762 (1987)).

In the instant case, Plaintiff's potential claim to an entitlement to "prevailing party" status is even weaker than in <u>Walker</u>. Presumably, the <u>Walker</u> plaintiff had established a claim of sexual harassment within the time period required for an actionable Title VII claim; Plaintiff here did not do so. The jury found that Plaintiff had been subjected to harassment but not within the period required to have rendered her claim timely. The jury's finding that

no acts of harassment occurred within the required time frame is not merely a technicality; it is a bar to relief, whether in the form of damages or attorney's fees.  See Bonner v. Guccione, 178 F.3d 581, 583, 594 (2d Cir. 1999) (concluding, in case where plaintiff "was not awarded damages on her Title VII hostile work environment sexual harassment claim because she failed to establish that she sustained any damage within the period of her employment that was not time-barred," that the plaintiff was not entitled to fees under Title VII because she "failed to obtain either an enforceable judgment or settlement agreement against the defendants on her Title VII cause of action," as "[t]he jury's liability finding on the Title VII cause of action entitled plaintiff to none of these—there was simply nothing to 'enforce'").

Here, the jury did not even reach the question of damages; having found no event occurring within the requisite time period, it would have been improper for the jury to have made any damage award.  If this case had been more straightforward as to timely filing—that is, if there had not been a factual issue involved and the Court had been able to rule on the matter of timeliness prior to trial—surely Plaintiff would not be the "prevailing party."  The result is no different where a jury finds as a matter of fact that the claim was not brought within the timeline required by the administrative scheme.  An untimely claim is an untimely claim, whether determined to be so by a judge or by a jury; a party cannot "prevail" on such a claim.

Plaintiff also asserts that she is entitled to fees because she obtained a monetary recovery on her state law battery claim, a claim which she alleges "shares a common nucleus of operative fact" with the Title VII claim.  Plaintiff contends that "the successful

-14-

battery claims all sound in sexual harassment and would be in the same time frame." (Doc. 258 at 10). This argument is not well-taken.

Courts have sometimes allowed fees where a plaintiff prevails only on state law claims, but those cases are distinguishable from this one. For example, in <u>Skokos v. Rhoades</u>, 440 F.3d 957, 962 (8th Cir. 2006), the court explained, citing the legislative history of 42 U.S.C. § 1988, that "where a federal court grants relief on a state-law claim to avoid a constitutional issue, it may award attorney's fees if the constitutional claim was 'substantial' and both the constitutional and the state-law claims arose out of a 'common nucleus of operative fact.'" However, in this case relief was not granted on a state-law claim to avoid a constitutional issue; there is no constitutional issue involved here at all. Instead, the jury made a factual determination that none of the events underlying the sexual harassment claim occurred within the requisite time frame. <u>See</u> <u>Bonner</u>, 178 F.3d at 595 (finding that plaintiff was not entitled to "prevailing party" attorney's fees under Title VII even though she prevailed on state law sexual harassment claim, stating that the argument that the "fortuitous circumstances" of her federal and state claims being tried together "entitle her to prevailing party status is akin to the equation of 0 + 0 = 1" and "would award plaintiff hundreds of thousands of dollars on a time-barred Title VII claim, thus nullifying the 'value judgment [made by Congress] concerning the point at which the interests in favor of protecting valid claims are outweighed by the interest in prohibiting the prosecution of stale ones'" (quoting <u>Johnson v. Ry. Express Agency, Inc.</u>, 421 U.S. 454, 463-64 (1975)) (alteration in original).

Plaintiff relies on <u>Bridges v. Eastman Kodak Co.</u>, 102 F.3d 56 (2d Cir. 1996), and <u>Hall</u>

v. Western Production Co., 988 F.2d 1050 (10th Cir. 1993), but they are easily distinguished. In Bridges, the three plaintiffs' Title VII sexual harassment claims were tried to the court at the same time their state law sexual harassment claims were tried to a jury.  The jury awarded backpay and compensatory damages on the state law claims, but the jury then subtracted all of the backpay of one of the plaintiffs because that plaintiff had not mitigated her damages.  The court echoed the jury's findings but declined to award additional damages under Title VII because to do so would have resulted in duplicative awards.  The Second Circuit affirmed the district court's finding that all three plaintiffs were "prevailing parties"—even the one whose backpay had been negated by failure to mitigate.  The only reason that plaintiff had not been awarded compensatory damages on her Title VII claim, however, was that she had already been awarded such damages on her parallel state law claim.  Such is not the situation here.

Hall is distinguishable for the same reason.  There, the plaintiff brought a federal claim under the Age Discrimination in Employment Act ("ADEA") and a state law claim for breach of contract.  Both claims were tried to a jury.  The jury found age discrimination but that the plaintiff had sustained no damages on that claim, and it further found for plaintiff on the breach of contract claim, awarding $41,793 in damages.  The court then awarded attorney's fees to the plaintiff as the "prevailing party" under the ADEA.  The appellate court affirmed the award, noting that the jury had been specifically instructed that it could find for plaintiff on both of his claims but it could not award duplicative damages.  In the instant case, by contrast, the reason the jury did not award damages to Plaintiff on the Title VII claim was not because of a "duplicative damages" issue but because the jury never reached the question

-16-

of damages due to its finding that no timely event occurred.

Plaintiff was not the "prevailing party" on her Title VII or FCRA claims.  Her request

for a declaration of entitlement to attorney's fees under those statutes is therefore denied.

## II.  Motions Filed by Defendants

### A.  Defendants' Motion for Remittitur (Doc. 252); Defendants' Motion for New Trial (Doc. 253); and Defendants' Renewed Motion for Judgment as a Matter of Law (Doc. 254)

Pursuant to Federal Rule of Civil Procedure 50(b),[7] Defendants have moved for

judgment as a matter of law, arguing:  that "[t]he record does not support the jury's finding

that Siegel committed a battery upon" Plaintiff; that "[t]he record does not support the jury's

conclusion that compensable damages were directly and proximately caused by the

purported battery"; that "[t]he record does not support the compensatory damages awarded

by the jury"; that "[t]he record does not support a finding, by clear and convincing evidence,

that punitive damages were warranted"; and that "[t]he amount of punitive damages far

exceeds anything that the record supports."  (Doc. 254 at 2).  Defendants have also, under

Rule 59, moved for a new trial (Doc. 253) on the bases that the damages awards are

excessive; that the battery verdict is against the clear weight of the evidence, and that juror

_____

[7]Plaintiff argues in her opposition memorandum that the Court may not grant relief on Defendants' Rule 50(b) motion because the motion "addresses completely different subject matter than the Rule 50(a) motion made at trial."  (Doc. 270 at 1).  Plaintiff contends that Defendants moved for judgment as a matter of law at trial only on the sexual harassment claims and not with regard to the battery claim.  (See id.).  Plaintiff is mistaken.  Defendants clearly moved for judgment as a matter of law on the battery claim in a timely fashion.  (See Trial. Tr. Feb. 19, 2008, Doc. 242, at 140); see also Fed. R. Civ. P. 50(a)(2) ("A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury.").  The Court finds all Rule 50 issues properly preserved by Defendants.

concealment tainted the verdict.  Also under Rule 59, Defendants seek remittitur of the

damages awards.  (Doc. 252).

    1.  Standards for Rule 50 and Rule 59 Motions

    Judgment as a matter of law "is appropriate when a plaintiff presents no legally

sufficient evidentiary basis for a reasonable jury to find for him on a material element of his

cause of action."  Christopher v. Florida, 449 F.3d 1360, 1364 (11th Cir. 2006).  "But if there

is substantial conflict in the evidence, such that 'reasonable and fair-minded persons in the

exercise of impartial judgment might reach different conclusions, the motion must be

denied.'"  Id. (quoting Walker v. NationsBank of Fla. N.A., 53 F.3d 1548, 1555 (11th Cir.

1995)).  As a California district court explained when addressing motions under Rules 50 and

59:

> Judgment as a matter of law following a jury verdict is proper if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's.  Judgment as a matter of law is improper if there is substantial evidence to support the jury's verdict.  "Substantial evidence" is admissible evidence that reasonable minds might accept as adequate to support a conclusion.  In considering a motion under Rule 50, the court does not assess the credibility of witnesses, and does not weigh the evidence, but [instead] draws all factual inferences in favor of the nonmoving party.  Finally, the court may not substitute its judgment of the facts for the judgment of the jury.
>
> Similarly, the Court has discretion to grant a new trial under Rule 59 if the verdict appears . . . to be against the weight of the evidence.  A new trial is warranted where the verdict is contrary to the clear weight of the evidence and the verdict results in the miscarriage of justice.

Westerfield v. Wade, No. CV 05-6645 ABC (CWx), 2008 WL 1931240, at *1 (C.D. Cal. Apr.

9, 2008) (citations and internal quotations omitted) (alterations in original). "On a Rule 59 motion, a district court may set aside the jury's verdict and grant a new trial only if '(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'" Hughston v. New Home Media, 552 F. Supp. 2d 559, 570 (E.D. Va. 2008) (quoting Bennett v. Fairfax County, 432 F. Supp. 2d 596, 602 (E.D. Va. 2006)).

    2. Evidence of Battery

    Defendants seek judgment as a matter of law on the basis that the record does not support the jury's finding that a battery occurred. They challenge whether there was evidence of a battery occurring after May 21, 2000 as required for the claim to be timely, and they also contend that a reasonable jury could not conclude that any touchings caused "harm or offense" to Plaintiff. Further, Defendants claim that they are entitled to a new trial because the verdict is against the clear weight of the evidence and will result in a miscarriage of justice if allowed to stand. These assertions are not well-taken.

    The jury found that conduct constituting battery occurred within the required time frame–on or after May 21, 2000. Plaintiff testified that during the "latter half of the year 2000, after May," there were "many" "incidents where David Siegel came to the spa and touched" her. (Trial Tr. Feb. 12, 2008, Doc. 238, at 85). This included an occasion where he pushed her against a wall. (Id. at 85-86). Plaintiff also testified that Mr. Siegel slapped her on the buttocks and that she was "upset," "sad," and "hurt" about these events that occurred "during [her] last few months of employment"; did not want to go to work; and felt deflated when she

went home at night; and was "on an emotional roller coaster" because she loved her job but did not enjoy Mr. Siegel's actions.  (Id. at 88, 103, 109-10).  Plaintiff was employed with the company until December 2000, so the "last few months of employment" were clearly within the post-May 20 timeframe.[8]

Another witness, Kelly Oehrle, testified that she saw Mr. Siegel touch Plaintiff at the spa.  (Trial Tr. Feb. 13, 2008, Doc. 239, at 86).  Ms. Oehrle worked at the spa from May 1, 2000 until December 1, 2000 (id. at 84); thus, all but the first three weeks of her employment was within the required time frame for the battery.  Ms. Oehrle recounted two occasions where she observed Mr. Siegel touching Plaintiff.  First, she described an afternoon when Mr. Siegel and his wife came into the spa and Mr. Siegel "reach[ed] out and touch[ed]" Plaintiff.  (Id. at 86).  According to Ms. Oehrle, Mr. Siegel "lean[ed] into" Plaintiff and invited Plaintiff to come home with him and his wife.  (Id. at 86-87).  Plaintiff tried "to be as professional as she possibly could be" during this incident, and Ms. Oehrle saw her try to push Mr. Siegel away and say "Don't do that."  (Id. at 87).  Mr. Siegel's young daughter was also present, running around Mr. Siegel's legs; after Plaintiff commented that the daughter should not crawl on Mr. Siegel's legs, Mr. Siegel said something to Plaintiff like "why don't you come home and crawl all over [my] legs and . . . body."  (Id. at 86-89).  After this

_____

[8]Plaintiff also testified that she performed eight to ten spa treatments called "seaweed gamage" on Mr. Siegel at the spa and that while he was in the "cocoon stage" of the treatments "he would let his hands wander and wander up the back of [her] legs and on to [her] butt."  (Trial Tr. Feb. 12, 2008, Doc. 238, at 89-91; see also Trial Tr. Feb. 13, 2008, Doc. 239, at 43-45).  However, there was no testimony about exactly when these incidents occurred, though they must have been sometime after November 1999, when the spa opened.

occurred, Plaintiff offered her apologies to Ms. Oehrle for having to witness the incident. (Id. at 89). In the second incident that Ms. Oehrle observed, Mr. Siegel was standing very close to Plaintiff in the hallway of the spa, with his hand on her shoulder, "leaning into her." (Id. at 89-90). Plaintiff's back was up against the wall, and Plaintiff was trying to maintain her composure and was motioning with her hands for Mr. Siegel to "back off." (Id. at 90). When the incident was over, Plaintiff appeared relieved. (Id.). As noted earlier in this Order, during her rebuttal case, Plaintiff testified that Ms. Oehrle was present for pinning incidents a couple of months after Oehrle was hired and again right before Ms. Oehrle left. (Trial Tr. Feb. 19, 2008, Doc. 242, at 157-58). This testimony is sufficient to support a finding by the jury that a battery occurred sometime on or after May 21, 2000.[9]

Additionally, a jury issue was clearly presented regarding the matters of "offense or harm" and causation. "A battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent." Paul v. Holbrook, 696 So. 2d 1311, 1312 (Fla. 5th DCA 1997). "[T]he tort of battery exists to protect the integrity of the person." Id. (citing W. Page Keeton, et al., Prosser and Keeton on Torts § 9 (5th ed. 1984)). "'Proof of the technical invasion of the integrity of the plaintiff's person by even an entirely harmless, but offensive contact entitles

---

[9]The Court rejects Defendants' argument that the jury must have concluded that the battery occurred after September 15, 2000. This argument is based on the fact that the jury found no act of sexual harassment occurring on or after September 15, 2000, yet found that an incident of battery occurred on or after May 21, 2000. Although a battery of the kind described at trial could form part of a sexual harassment claim, it need not necessarily be part of one. In other words, the jury could have found that an act of battery occurred between May 21, 2000 and September 14, 2000 that was not part of the sexual harassment that the jury determined occurred sometime before September 15, 2000.

the plaintiff to vindication of the legal right by an award of nominal damages, and the establishment of the tort cause of action entitles the plaintiff also to compensation for the resulting mental disturbance, such as fright, revulsion or humiliation." Id. (quoting Prosser and Keeton § 9).  Further, "[t]he element of personal indignity involved always has been given considerable weight.  Consequently, the defendant is liable not only for contact[s] which do actual harm, but also for those relatively trivial ones which are merely offensive and insulting . . . ." Id. (quoting Prosser and Keeton § 9).  "No evidence of an intention to cause harm is necessary." Id.; cf. Beard v. Flying J, Inc., 266 F.3d 792, 803 (8th Cir. 2001) (rejecting defendant's argument that he was entitled to a judgment notwithstanding the verdict because there was no evidence that the plaintiff was injured by the battery, noting that under Iowa law "[w]hen, as here, the defendant's conduct was intentional, a plaintiff is entitled to damages for emotional distress . . . even if he or she suffered no physical injury").

"Offensiveness is an essential element of the tort," and the Paul court found that "[t]he act of approaching a co-worker from behind while on the job and attempting to massage her shoulders" presented "a question of fact for the trier of fact to decide."  696 So. 2d at 1312. So, too, in this case; there was conflicting evidence for the jury to resolve as the finder of fact on the issues of offensiveness and causation.  Although Defendants assert that other events going on during this timeframe caused whatever distress Plaintiff was suffering, there was evidence from which the jury could reasonably conclude that Mr. Siegel's touching of Plaintiff caused her emotional harm.  Defendants are not entitled to judgment as a matter of law on the issue of whether a battery occurred.

Moreover, Defendants' motion for a new trial on the basis that the verdict on the

battery claim is against the clear weight of the evidence (see Doc. 253 at 5-7) is without merit.  In support of this part of their new trial motion, Defendants assert that "[t]he jury here deliberated for barely three (3) hours in [a] case which took six days to try" and aver that "[a]n honest and fair deliberation by eight impartial jurors could not be conducted in that time."  (Id. at 6).  Defendants further argue that the jury "responded in a trivial way" to "the complicated interplay between the hostile work environment and battery analyses," the timing issues, and other matters presented at the trial.  However, these points are not well-taken.

First, "the length of time the jury deliberates is immaterial" so long as "the evidence is sufficient to support the verdict."  Marx v. Hartford Accident & Indem. Co., 321 F.2d 70, 71 (5th Cir. 1963).  As discussed earlier, the evidence is sufficient in this case.  Moreover, a three-hour deliberation in a six-day case is not unduly short or indicative of any lack of attention by the jury in any event, and indeed, the fact that the jury reached different conclusions with regard to the timeliness of the hostile environment and battery claims indicates that the jury paid careful attention to the details and the issues before them.  The jury's verdict for Plaintiff on the battery claim is not against the clear weight of the evidence that was presented at trial, and Defendants are not entitled to a new trial on this basis.

### 3.  Compensatory Damages

Defendants challenge both the award of compensatory damages on the battery claim and the amount of those damages.  They argue that Plaintiff did not establish emotional pain caused by the battery so as to support an award of damages, and they contend that the amount of damages awarded is excessive and not supported by the evidence.  Defendants

also claim entitlement to a new trial based on the size of the award.

The Court will not disturb the compensatory damages award.  It was undisputed that Plaintiff was not physically injured by the battery, and accordingly the jury was instructed that the elements of compensatory damage on the battery claim were "emotional pain and mental anguish."  (See Jury Instructions, Doc. 232, at 17).  Plaintiff's trial testimony is sufficient to establish compensable damages; medical testimony in corroboration of emotional distress is not required.  See, e.g., Muñoz v. Oceanside Resorts, Inc., 223 F.3d 1340, 1348-49 (11th Cir. 2000) (upholding award of compensatory damages for emotional distress on FCRA claim despite lack of medical testimony; plaintiff's "testimony concerning the emotional and dignitary impact of [his] termination was sufficient to justify the jury's award"); Malta v. Slagle, No. 05-CV-342S, 2008 WL 4147134, at *3-4 (W.D.N.Y. Sept. 3, 2008) (declining to vacate award of damages for emotional distress in § 1983 case, stating that the "failure to provide medical evidence of injuries does not preclude an award of emotional distress damages" and that "there was evidence of harassing conduct by Defendants which substantiated [one of the plaintiff's] testimony concerning her anxiety and emotional distress").  Although the Defendants contend that Plaintiff did not describe at length the emotional pain and mental anguish she suffered, there was sufficient testimony at trial from Plaintiff and Ms. Oehrle supporting an award of damages for emotional pain and mental anguish in this case.

Defendants also argue that the compensatory damages award of $102,223.14 is excessive.  In a case such as this where a pendent state law claim is involved, the issue of the excessiveness of a damage award is governed by federal standards but guided by state law.  In other words, "'[t]he role of the district court is to determine whether the jury's verdict

is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered.'" Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 435 (1996) (quoting Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279 (1989)); see also Johnson v. Clark, 484 F. Supp. 2d 1242, 1256 (M.D. Fla. 2007) ("The decision whether to grant a new trial or remittitur on the grounds of excessive damages is a matter within the sound discretion of the district court.  In a diversity case, the court looks to state substantive law to determine whether the verdict is excessive."); cf. Lundgren v. McDaniel, 814 F.2d 600, 605 (11th Cir. 1987) ("[T]he *Erie* doctrine also applies to pendent state claims litigated in federal courts.").

The Florida statute regarding court assessment of a jury's damage awards provides in pertinent part that "[i]n any action . . . wherein the trier of fact determines that liability exists on the part of the defendant and a verdict is rendered which awards money damages to the plaintiff, it shall be the responsibility of the court, upon proper motion, to review the amount of such award to determine if such amount is excessive . . . in light of the facts and circumstances which were presented to the trier of fact." § 768.74(1), Fla. Stat.  This statute expressly states that "[i]t is the intention of the Legislature that awards of damages be subject to close scrutiny by the courts and that all such awards be adequate and not excessive."  Id. § 768.74(3).  Moreover:

> In determining whether an award is excessive or inadequate in light of the facts and circumstances presented to the trier of fact and in determining the amount, if any, that such award exceeds a reasonable range of damages or is inadequate, the court shall consider the following criteria:
> (a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;

(b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;

(c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;

(d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and

(e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

Id. § 768.74(5). As Florida's Fourth District Court of Appeal recently noted, "[t]his is a generic list," City of Hollywood v. Hogan, 986 So. 2d 634, 648 (Fla. 4th DCA 2008), and in the employment discrimination setting[10] other criteria that courts have considered include "whether the plaintiff lost the esteem of her peers," "suffered physical injury as a consequence of her emotional distress," "received psychological counseling or other medical treatment," or "suffered a loss of income"; "the degree of emotional distress," "the context of the events surrounding the distress"; "the evidence tending to corroborate the plaintiff's testimony"; "the nexus between the challenged conduct and the emotional distress," and "any mitigating circumstances," id. (citing Price v. City of Charlotte, 93 F.3d 1241, 1254 (4th Cir. 1996)).

Considering the statutory and judicially-noted criteria, the Court is unable to conclude that the award of just over $100,000 in this case is outside the "reasonable range," though

---

[10]The Court recognizes that the claim now at issue is Plaintiff's battery claim and not her Title VII or FCRA claim. However, the battery occurred in the employment setting and was related to her discrimination claims. Thus, the factors noted in the employment discrimination setting are also instructive here.

it is certainly at the upper end of that range.  Courts have recognized that review of "'awards of compensatory damages for intangible, emotional harms is deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses.'"  Muñoz v. Oceanside Resorts, Inc., 223 F.3d 1340, 1349 (11th Cir. 2000) (quoting Ferrill v. Parker Group, Inc., 168 F.3d 468, 476 (11th Cir. 1999)); accord Landis v. Landis, 664 N.E.2d 754, 757 (Ind. Ct. App. 1996) ("Awards for pain, suffering, fright, humiliation and mental anguish are particularly within the province of the jury because they involve the weighing of evidence and credibility of witnesses.").

Awards for emotional distress damages vary widely, and judgments for $100,000 or more have been upheld even where a plaintiff relies on her own testimony to establish emotional distress.  Cf. Muñoz, 223 F.3d at 1349 (upholding $150,000 emotional distress verdict in age discrimination case where plaintiff's testimony was the sole evidence of emotional damage); City of Hollywood v. Hogan, 986 So. 2d 634, 649 (Fla. 4th DCA 2008) (noting that in discrimination cases, "'an award of $150,000 for emotional distress should be viewed as an upper threshold'" (quoting Bernstein v. Sephora, 182 F. Supp. 2d 1214, 1229 (S.D. Fla. 2002)))[11]; Landis, 664 N.E.2d at 758 (finding that award of $537,200 for pain,

---

[11]In Hogan, the Fourth District Court of Appeal noted that in "'garden-variety mental-anguish claims . . . awards hover in the range of $5,000 to $30,000'" and that such cases generally involve evidence of damages only in the form of "'testimony of the plaintiff, who describes the emotional distress in vague or conclusory terms, presents minimal or no evidence of medical treatment, and offers little detail of the duration, severity, or consequences of the condition.'"  986 So. 2d at 649 (quoting Reiter v. Metro. Transp. Auth. of N.Y., No. 01 Civ. 2762(JGK), 2003 WL 22271223, at *9 (S.D.N.Y. Sept. 30, 2003)).  The court nevertheless set the cap for noneconomic damages in the case before it at $150,000 for one of the plaintiffs, who testified that he felt stressed and had been diagnosed with high blood pressure but did not present evidence of a causal connection between his denied

suffering, and emotional distress in case involving claims of assault and battery, intentional infliction of emotional distress, and intentional interference with business relationship was not excessive); Baldwin v. McConnell, 643 S.E.2d 703, 705-06 (Va. 2007) (reversing, as abuse of discretion, trial court's remittitur of compensatory damages on counterclaim for assault and battery from $240,000 to $1000 and reinstating verdict to extent of $100,000 as claimed in ad damnum clause); Nash v. Sue Har Equities, LLC, 846 N.Y.S.2d 215, 216 (App. Div. 2007) (reducing damages on assault claim from $190,000 to $100,000, noting that "although [the court was] mindful that considerable deference is to be afforded the jury's interpretation of the evidence . . . the award of $190,000 for pain and suffering so materially deviates from what would be reasonable compensation [that the court] exercise[d] its discretion and reduce[d] the award"; "the plaintiff . . . suffered pain to his head and a laceration requiring several stitches" but his "testimony as to his injuries . . . was not amplified by other competent testimony, expert or otherwise, sufficient to establish the severity and permanency of his injuries and does not support the monetary award"); Stockett v. Tolin, 791 F. Supp. 1536, 1556 (S.D. Fla. 1992) (awarding, after bench trial, compensatory damages in the aggregate amount of $250,000 on female employee's Florida state law claims of battery, invasion of privacy, false imprisonment, and intentional infliction of emotional distress against her male boss; battery involved "the repeated and offensive touching of the most private parts of [the p]laintiff's body").[12] Inappropriate comments made

---

promotion and his high blood pressure. See id. at 647-50.

[12]In other cases, awards have been lower. See, e.g., Worth v. Tyer, 276 F.3d 249, 268-69 (7th Cir. 2001) (upholding battery damages of $50,000 where defendant touched

during the touchings, such as those testified to by Ms. Oehrle, may be taken into account in assessing damages, as may the fact that Mr. Siegel was Plaintiff's boss and that he touched her in front of other employees during business hours; such circumstances add to the humiliation.  Cf. Hughston, 552 F. Supp. 2d at 567 (noting, in reviewing jury's assessment of compensatory damages on battery claim, that "[t]here can be few more insulting injuries than being subjected to unwelcome sexual touchings by a supervisor, accompanied by lewd solicitations for sex, in the workplace").

Although there is at least one mitigating circumstance in this case—the fact that Plaintiff and Mr. Siegel were, as Plaintiff herself acknowledged, "friends" who socialized with one another through the end of her employment (see Doc. 238 at 179), affording deference to the jury's determination and in light of the comparable awards that have been upheld in

_____

plaintiff's breast for several seconds); Hughston v. New Home Media, 552 F. Supp. 2d 559, 566-67 (E.D. Va. 2008) (finding that jury's $40,000 compensatory damage award solely for emotional harm on battery claim was "not out of proportion to [the plaintiff's] emotional injuries" where supervisor "repeatedly subjected [the plaintiff] to such indignities as touching her buttocks, breasts, crotch, and shoulders . . . over a three month period"); Meadows v. Guptill, 856 F. Supp. 1362, 1371-72 (D. Ariz. 1993) (awarding $2500 in compensatory damages on battery claim following bench trial where the defendant "frequently patted [the plaintiff] on the rear end over a seventeen month period"; "grabbed her buttocks with both hands" on one occasion; cornered the plaintiff "and forced his body to press up against her body"; and grabbed or tugged at plaintiff's blouse; plaintiff was also awarded $50,000 on hostile work environment claim and $50,000 in punitive damages); Lowrey v. Pettit, 737 So. 2d 213, 217 (La. Ct. App. 1999) (reducing damages award on battery claim from $30,000 to $15,000 where plaintiff, who alleged battery by her boss in the form of unwanted touchings, "did not produce any medical records of treatment for her condition and the duration of her symptoms [was] unclear from the testimony"; the plaintiff "suffered from a continuing pattern of batteries . . . during a period of approximately two years" and "testified that she felt violated by the defendant's conduct and . . . was often emotionally upset and nervous [and] experienced trouble sleeping and eating due to the anxiety and stress caused by defendant's unwelcome physical contact").  The Court's role, however, is not to substitute its judgment for that of the jury as the factfinder but to review the award for excessiveness.

other cases, the Court will not disturb the amount of the jury's compensatory damages award.[13]  Defendants' Rule 50 and Rule 59 motions are denied with regard to compensatory damages.

### 4.  Punitive Damages

Defendants contend that punitive damages may not be appropriately awarded in this case.   Additionally, Defendants challenge the amount of punitive damages awarded as excessive.

The Court cannot conclude as a matter of law that the evidence did not support the imposition of punitive damages.[14]  Under Florida law, "[a] defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that

---

[13]The Court rejects Defendants' contention that the amount of compensatory damages is suspect because it is equivalent to the amount of Plaintiff's final annual salary.  The Court will not reduce or vacate the award on this basis alone, and as noted by Plaintiff, juries sometimes award equivalent amounts of emotional distress damages and lost wages.  See, e.g., Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1275 (11th Cir. 2008) (noting jury's verdict of $27,160.59 in back pay and an equal amount for mental anguish in Title VII case). Even though lost wages were not an element of damages in the case at bar, the fact that the jury decided upon this amount for the emotional anguish compensation does not render it per se unreasonable.  The Court does not conclude, as urged by Defendants, that the jury improperly awarded Plaintiff lost wages on this claim despite being instructed that it could not do so.

[14]This portion of Defendants' challenge to the award of punitive damages arises under Rule 50.   See EEOC v. W&O, Inc., 213 F.3d 600, 610 (11th Cir. 2000) (noting that a "challenge to the sufficiency of the evidence as to punitive damages is governed by" Rule 50).  Plaintiff asserts in her response memorandum that Defendants did not preserve their argument regarding submitting the issue of punitive damages to the jury.  (See Doc. 270 at 18).  However, the Court finds the argument preserved.  (See Trial Tr. Feb. 19, 2008, Doc. 242, at 177, 188 (court's ruling that punitive damages instruction will be given, noting that "[t]o the extent that was a Rule 50 motion, it's denied," and discussing the standard for punitive damages on the battery claim)).

the defendant was personally guilty of intentional misconduct or gross negligence." §
768.72(2), Fla. Stat.  The "gross negligence" facet did not apply in this case because battery
is an intentional tort, and the jury was duly instructed that it could award punitive damages
on the battery claim only if it found, "based on clear and convincing evidence, that David
Siegel was personally guilty of intentional misconduct." (Jury Instructions, Doc. 232, at 23).
"Intentional misconduct," as defined by Florida statute and the jury instructions, "means that
the defendant had actual knowledge of the wrongfulness of the conduct and the high
probability that injury or damage to the claimant would result and, despite that knowledge,
intentionally pursued that course of conduct, resulting in injury or damage." § 768.72(2)(a),
Fla. Stat.; (see also Doc. 232 at 23).

Florida courts have held that the commission of intentional battery "supplies the
requisite proof . . . justifying a punitive damages award." Canseco v. Cheeks, 939 So. 2d
1122, 1123 (Fla. 3d DCA 2006).   In the instant case, a reasonable jury could have
concluded—if it accepted the evidence presented by Plaintiff, as was its prerogative—that
Mr. Siegel knew he was acting wrongfully and that there was a high probability that injury or
damage to Plaintiff would result.  Cf. Hughston, 552 F. Supp. 2d at 568-69 (finding that
evidence supported jury's finding of entitlement to punitive damages on battery claim under
Virginia law; defendant was plaintiff's direct supervisor, conduct persisted over a three-month
period, and the plaintiff's "testimony demonstrate[d] that she suffered great indignities at the
hands of [the defendant] that understandably caused her to feel embarrassment, humiliation,
fear, and anger"); Beard, 266 F.3d at 804 ("The evidence . . . tended to show that [the
defendant] intentionally touched [the plaintiff's] breasts, and a jury could certainly infer that

he did so with a willful disregard for [her] rights.  We therefore believe that the record contains more than sufficient evidence to allow a jury to award punitive damages.").  Defendants' motion for judgment as matter of law on the issue of whether punitive damages could be awarded at all on the evidence presented is denied.

Defendants also challenge the amount of punitive damages—$5,276,640—as excessive.[15]  As with the award of compensatory damages, this Court's review of the size of the punitive damages award is conducted under federal standards but guided by state law.  "In a . . . lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law.  Federal law, however, will control on those issues involving the proper review of the jury award by a federal district court and court of appeals."  Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 278-79 (1989) (footnote omitted).

This Court's first task is "to determine whether the jury's verdict is within the confines set by state law."  Id. at 279.  The award of punitive damages of over $5 million is not within these confines, and therefore it cannot stand.  The Florida legislature has placed caps on punitive damages awards, and the instant award is subject to those caps.  Generally, "[a]n award of punitive damages may not exceed the greater of . . . [t]hree times the amount of

---

[15]The parties dispute whether this challenge is properly brought under Rule 50 or Rule 59.  To the extent the issue is whether the amount is sustainable as a matter of law—that is, under a statutory cap or the Constitution—the motion arises under Rule 50, but with regard to whether it should be reduced via remittitur, it arises under Rule 59.  See Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1331 (1999) (noting that "a court proceeds under Rule 50, not Rule 59, in the entry of judgment for a constitutionally reduced award").

compensatory damages . . . or . . . [t]he sum of $500,000." § 768.73(1)(a), Fla. Stat. The only potentially applicable exception to this limitation is that "[w]here the fact finder determines that at the time of injury the defendant had a specific intent to harm the claimant and determines that the defendant's conduct did in fact harm the claimant, there shall be no cap on punitive damages." Id. § 768.73(1)(c).

Although Plaintiff asserts in her opposition memorandum that the jury made the requisite findings under section 768.73(1)(c) to support an unlimited punitive damages award, the jury did not do so. The jury was instructed, in accordance with the Florida standard jury instruction on this issue, that it should *consider* whether Mr. Siegel "had a specific intent to harm the Plaintiff and [whether] the conduct of [Mr.] Siegel did in fact harm the Plaintiff" (Doc. 232 at 24), but the verdict form does not indicate that the jury made either of these findings.[16] Absent such findings, under the plain terms of the statute, the award is subject to the cap in section 768.73(1)(a)—$500,000.

Defendants' main argument with regard to the amount of the punitive damages award is that is excessive and must be reduced under both Florida's remittitur statute, section 768.74, Florida Statutes,[17] and the U.S. Constitution. Defendants focus on the total award,

---

[16]Plaintiff's counsel did not object to the verdict form with regard to punitive damages, and the proposed verdict form that Plaintiff proposed before trial (Doc. 207) did not ask the jury to make these findings. Plaintiff cannot now claim entitlement to uncapped punitive damages without these findings in the face of a plainly written Florida statute that requires specific determinations by the fact finder in order for the caps not to apply.

[17]The punitive damages cap statute, section 768.73(1), provides in part that "[t]his subsection is not intended to prohibit an appropriate court from exercising its discretion under s. 768.74 in determining the reasonableness of an award of punitive damages that is" within the statutorily capped amount. § 768.73(1)(d), Fla. Stat.

mentioning the statutory cap discussed above only in a footnote.   However, the excessiveness of the award under Florida's punitive damages cap statute was the first step, and the remittitur and unconstitutionality analysis must focus on this new, capped amount. Cf. St. John v. Coisman, 799 So. 2d 1110, 1112 (Fla. 5th DCA 2001) ("Where punitive damages are challenged on federal constitutional grounds in a state court, the first step in the analysis should be to determine whether state statutes apply to potentially limit or reduce the damages.  If they do and the result is remittitur or reduction, this may obviate the federal constitutional challenge.  But even if reduced, punitive awards may still need to be reviewed under the federal criteria, since the federal criteria are not the same as the state criteria for limiting, capping, or reducing the award."); EEOC v. W&O, 213 F.3d 600, 614 (11th Cir. 2000) (addressing argument "that the punitive damages awarded, even after reduction pursuant to the statutory cap, [were] excessive").  This Court will consider the constitutional guideposts established by the Supreme Court together with the considerations in Florida's remittitur statute in assessing whether further reduction in the punitive damages amount is warranted here.  Cf. W&O, 213 F.3d at 614 (noting that the constitutional analysis is also "'instructive' to courts considering the amount of punitive damages awarded in employment discrimination cases").

"The Supreme Court has held that due process forbids the imposition of grossly excessive or arbitrary awards of punitive damages." Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1282 (11th Cir. 2008) (citing BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 562 (1996)).  "In Gore, the Supreme Court instructed courts reviewing punitive damages awards to consider three guideposts:   (1) the degree of reprehensibility of the defendant's

misconduct; (2) the ratio between the actual or potential harm suffered by the plaintiff (compensatory damages) and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." Id. (citing Gore, 517 U.S. at 575).

The first Gore guidepost—the reprehensibility of the defendant's conduct—is "[t]he dominant consideration in the evaluation of a punitive damages award." Id. at 1283 (citing Gore, 517 U.S. at 575). In evaluating this reprehensibility, "a court must consider several issues: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident." Id.

Evaluating these issues, the harm here was emotional rather than economic; there is some disregard of health at play insofar as Plaintiff's emotional health was involved; financial vulnerability is implicated somewhat because, although this battery claim did not involve financial consequences for Plaintiff *per se*, the events did occur in the workplace and Plaintiff's boss—who controlled Plaintiff's earnings—was the one who committed the acts; there is some evidence of repeated actions, though only a six-month time period is at issue; and battery is an intentional tort, although malice is not required for its commission. On balance, Mr. Siegel's conduct is at the low to middle range of the reprehensibility scale.

With regard to the second Gore guidepost—the ratio between the punitive damages award and the compensatory damages—the Supreme Court has declined to definitively

declare the maximum permissible ratio but has held that "'[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with [higher] ratios.'" Goldsmith, 513 F.3d at 1283 (quoting State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003)) (second alteration in original). Here, the ratio was originally 51.6 to1 ($5,276,640 to $102,223.14) but is now, after the statutory cap has been taken into account and applied, less than 5 to 1 ($500,000 to $102,223.14). This ratio does not suggest an excessive award.

The final Gore guidepost—comparison to civil penalties allowed or imposed in similar cases–also does not suggest excessiveness in this case.   Florida law does allow for a criminal penalty for battery of up to one year imprisonment and a fine of not more than $1000.  See §§ 784.03(1), 775.082(4)(a), & 775.083(1)(d), Fla. Stat.  However, while "'[t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action,' when comparisons to criminal penalties are 'used to determine the dollar amount of the award . . . the criminal penalty has less utility.'" Kemp v. Am. Tel. & Tel. Co., 393 F.3d 1354, 1364 (11th Cir. 2004) (quoting Campbell, 538 U.S. at 428).  More telling is the Florida statutory cap on damages, which clearly provides for an award of up to $500,000.  Cf. EEOC v. W&O, Inc., 213 F.3d 600, 617 (11th Cir. 2000) (noting, in affirming district court's refusal to reduce punitive damages below statutory maximum, that 42 U.S.C. § 1981a "put [the defendant] on notice that it could be liable for punitive damages up to the statutory cap"); accord EEOC v. Fed. Express Corp., 513 F.3d 360, 378 (4th Cir. 2008) ("The statutory cap of $300,000 provided FedEx with fair notice of the range of available civil penalties for acts of discrimination that contravened the ADA.").  The concern noted in

Campbell, that "'[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose,'" 538 U.S. at 417 (quoting Gore, 517 U.S. at 574), is not implicated here.

Comparing the $500,000 award to awards that have been imposed in other cases, the award is not constitutionally suspect.  There is much variety in punitive damages awards, but similar or larger awards have been upheld, even where the ratio to compensatory damages is much higher.  See, e.g., Goldsmith, 513 F.3d at 1282-85 (upholding punitive damages award of $500,000 in § 1981 case where ratio to compensatory damages was 9.2 to 1); Weaver v. African Methodist Episcopal Church, 54 S.W.2d 575, 589 (Mo. Ct. App. 2001) (finding that punitive award of $1 million on battery claim, which constituted 66 to 1 ratio to compensatory damage award, was not excessive, where "there was evidence at trial from which the jury could believe that not only did [the defendant] commit a battery by grabbing [the plaintiff's] breasts but that act was merely the culmination of a long history of far worse verbal and physical sexual harassment"); see also Bogle v. McClure, 332 F.3d 1347, 1359-62 (11th Cir. 2003) (affirming award of $500,000 in compensatory damages to each plaintiff–as reduced by district court from $1 million for each plaintiff–and $2 million in punitive damages to each plaintiff in race discrimination case under § 1981)

Defendants contend that under the Florida remittitur statute factors, the jury's award[18] is "inexplicable" (Doc. 254 at 19) and that "the inflamed passions of the jury, not the relevant

---

[18]Again, Defendants' arguments are directed at the$5 million+ amount.  The Court assumes that Defendants would also argue that the $500,000 amount is also excessive.

facts established at the trial, . . . led to such an outrageously excessive award" (Doc. 253 at 10). Defendants seek not only a reduction in amount but also a new trial on this basis. However, the Court does not find that the jury acted out of improper considerations in assessing damages. While "[a] punitive damage award may not be 'grossly out of proportion to the severity of the offense,'" "in promoting deterrence, the economic wealth of a tortfeasor may be considered." Johansen, 170 F.3d at 1338 (quoting Gore, 517 U.S. at 576). For example, "[a] bigger award is needed to 'attract the attention . . .' of a large corporation." Id. (quoting Cont'l Res., Inc. v. OXY USA, Inc., 101 F.3d 634, 641 (10th Cir. 1996)) (second alteration in original). In this case the jury was instructed, in accordance with the Florida standard jury instructions, that it "should consider . . . each Defendant's financial resources" but that it could "not award an amount that would financially destroy the Defendants." (Doc. 232 at 24; see also Fla. Std. Jury Instruction PD 2(d)(2)). There are five defendants in this case—Mr. Siegel and four corporate entities of whom he undisputedly is the alter ego such that they are also liable for his actions. Mr. Siegel testified at trial that Defendant Westgate Resorts, Limited had a net worth of just over $471 million (Trial Tr. Feb. 14, 2008, Doc. 240, at 20); and that he individually had a net worth of more than $324 million, which includes his stock in the companies (id. at 19-20). Based on the $471 million figure, the original punitive damages award of $5,276,640 is just over 1% of that net worth estimate, and the capped award of $500,000 is only one tenth of one percent of net worth. Indeed, Defendants do not even assert that when viewed as a portion of their wealth the award is excessive. Cf. EEOC v. W&O, 213 F.3d at 616-17 (noting that defendant did "not argue that the award [was] disproportionate in comparison to the net worth of the company" and concluding that the

$300,000 punitive award "was reasonable in terms of the interest in deterring illegal discrimination").  Thus, the jury's large award in this case "could be adduced in a logical manner by reasonable persons" and does not appear to be the result of "prejudice, passion, . . . corruption," or other "improper elements of damages."  See § 768.74(5), Fla. Stat. (listing these among the criteria).

In <u>Johansen</u>, the Eleventh Circuit upheld the district court's reduction of a $15 million punitive damage award to $4.35 million even though it was 400 times greater than the authorized civil sanction, the defendant corporation's conduct in polluting the environment was not found to be highly reprehensible, and even the reduced punitive damages award resulted in a 100 to 1 ratio of punitive damages to civil damages.  Weighing the <u>Gore</u> factors, the court concluded "that substantial punitive damages are warranted for deterrence" and noted that Georgia statutes "provided fair notice to [the defendant] that it might be subject to a substantial penalty."  170 F.3d at 1339.  The court further noted that "[t]he 100:1 ratio of the punitive to the actual damages is at the upper limits of the Constitution, but is justified by the need to deter this and other large organizations from a 'pollute and pay' environmental policy."  <u>Id.</u>  The court thus found that the original award of $15 million was constitutionally excessive but that the reduced amount of $4.35 million was not.  <u>Id.</u>; <u>see also</u> <u>Kemp</u>, 393 F.3d at 1365 (finding that where plaintiff's actual damages were only $115 and punitive damages were $1 million, punitive award would be reduced to $250,000 because a lesser award "would not serve as a meaningful deterrent to a corporation like AT&T" but a greater award "would prove an unconstitutional windfall"); <u>cf.</u> <u>Estate of Despain v. Avante Group, Inc.</u>, 900 So. 2d 637, 640 (Fla. 5th DCA 2005) ("Punishment of the wrongdoer and

deterrence of similar wrongful conduct in the future, rather than compensation of the injured

victim, are the primary policy objectives of punitive damage awards.").

Further reduction of the $500,000 capped punitive damages award is not warranted

by either the Constitution or Florida law.[19]  While the conduct at issue is in the low to mid

range of the reprehensibility scale, the ratio of punitive damages to compensatory damages

is only 5 to 1, and in light of the extreme wealth of the Defendants a substantial award is

necessary to serve the purposes of punishment and deterrence.  A $500,000 award—the

maximum award allowed by state law—still represents only .1% of net worth for these

Defendants; this is the equivalent of a $100 penalty against someone with a $100,000 net

---

[19]The Eleventh Circuit has held, albeit in a Title VII case involving Title VII's damages caps, "that it is only appropriate for a judge to reduce a punitive damages amount to below the amount allowed under [Title VII's] statutory cap if the award is unreasonable or otherwise shock[s] the judicial conscience and constitute[s] a denial of justice." W&O, 213 F.3d at 617 (citations and internal quotations omitted) (alterations in original).  The $500,000 capped amount does not "shock the conscience" or result in a denial of justice here.

In a Tenth Circuit case cited in W&O, the court rejected the argument that "the statutory maximum should be reserved for the most severe misconduct," and held that "only when an award would 'shock the judicial conscience, and constitute a denial of justice,' for example because it would 'result in the financial ruin of the defendant' or 'constitute a disproportionately large percentage of a defendant's net worth,' will [it] reduce the award below the statutory cap." Deters v. Equifax Credit Info. Servs., 202 F.3d 1262, 1273 (10th Cir. 2000).  The Deters court declined to further reduce a punitive award in a Title VII sexual harassment case where district court had already reduced it from $1 million to $295,000 to conform to the statutory cap.  Compensatory damages in that case were $5000, and thus the ratio was 59 to 1.  The court noted the purpose "to punish and deter" and that "the wealth and size of the defendant are relevant considerations.  Id.  Thus, the defendant's gross annual operating revenue of $1.8 billion was properly considered in that case. Id.; see also Romano v. U-Haul Int'l, 233 F.3d 655, 673 (1st Cir. 2000) (noting, in Title VII case, that "a punitive damages award that comports with a statutory cap provides strong evidence that a defendant's due process rights have not been violated," and upholding punitive damages of $285,000 as reduced by district court to conform to cap where ratio to compensatory damages was 19 to 1).

worth.

In sum, because as a matter of state law punitive damages may not exceed $500,000 in this case, the award of punitive damages must be reduced to no more than that amount. The Court does not find, however, that this amount is unconstitutionally excessive or in need of further reduction under Florida's remittitur statute under the circumstances of this case, nor is a new trial warranted based on the size of the jury's award.   Thus, the punitive damages award will be reduced to $500,000.[20]

_____

[20]Because this finding is as a matter of law, it is not a "traditional remittitur" and Plaintiff need not be given the option of a new trial on punitive damages; the Seventh Amendment right to a jury trial is not implicated by the reduction.  See Estate of Sisk v. Manzanares, 270 F. Supp. 2d 1265, 1277-78 (D. Kan. 2003) (noting that "[f]ederal courts uniformly have held that statutory damages caps do not violate the Seventh Amendment, largely because a court does not 'reexamine' a jury's verdict or impose its own factual determination regarding what a proper award might be . . .[but] simply implements a legislative policy decision to reduce the amount recoverable to that which the legislature deems reasonable"); see also Arismendez v. Nightingale Home Health Care, Inc., 493 F.3d 602, 612 (5th Cir. 2007) (directing district court, without qualification, to remit punitive damages to state statutory cap of $200,000); cf. Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 429 n.9 (1996) ("While we have not specifically addressed the issue, courts of appeals have held that district court application of state statutory caps in diversity cases, postverdict, does not violate the Seventh Amendment."); Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1049-50 (8th Cir. 2002) (noting that "[w]hile the traditional remedy of remittitur does require the plaintiff's consent in order to comport with the Seventh Amendment right to jury trial, the court's mandatory review of a punitive damages award does not implicate the Seventh Amendment" and that "[t]he plaintiff's consent to a constitutional reduction of a punitive damages award is 'irrelevant' because the court must decide this issue as a matter of law"); Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1330-31 (11th Cir. 1999) (noting that "[w]here a portion of a verdict is for an identifiable amount that is not permitted by law, the court may simply modify the jury's verdict to that extent and enter judgment for the correct amount" and that "[a] constitutionally reduced verdict . . . is really not a remittitur at all" because it is not "a substitution of the court's judgment for that of the jury" but "a determination that the law does not permit the award"); Holmes v. W. Palm Beach Hous. Auth., 309 F.3d 752, 758 (11th Cir. 2002) (finding no abuse of discretion by trial court in not giving appellant the option of a new trial where as a matter of law the evidence did not support the amount of the verdict").

5.  Juror Concealment

In their Motion for New Trial, Defendants argue in part that a new trial is required because of "juror concealment of involvement in prior litigation."  (Doc. 253 at 2). Defendants aver that "it now appears that three jurors seated on this panel have been parties to litigation which they concealed during *voir dire*."  (Id. at 4).  More specifically, Defendants contend that one juror was involved in a 1999 suit on a promissory note, a 2000 suit to foreclose a mortgage, and another case involving an eviction; that a second juror was involved in a tenant eviction case in 1985; and that a third juror has been a plaintiff in two personal injury cases.  According to Defendants, if this "prior litigation" had been disclosed during voir dire, further inquiry of them would have been made by the Court and they would have been disqualified from the jury for cause.  This argument is wholly without merit.

As noted by Defendants, the Supreme Court held in McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556 (1984), that "to obtain a new trial [based on juror concealment], a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause."  Also as noted by Defendants, "the first prong of the McDonough test requires a determination of whether [the juror's] answers were honest, that is, whether he was aware of the fact that his answers were false," United States v. Perkins, 748 F.2d 1519, 1531 (11th Cir. 1984), and the second prong requires a showing of "actual bias," id. at 1532.  Defendants have not made either of these showings here.

First, Defendants have not even made a barebones showing that the three jurors whose conduct they challenge are the same people who were in the lawsuits.  Defendants

have only given case numbers of these lawsuits—one of which occurred more than twenty

years ago—and none of the three jurors at issue have unusual names; in other words, it is

far from clear that these jurors were even involved in prior litigation.  Plaintiff points out in her

response that in a newspaper article written shortly after this motion was filed, two of the

jurors denied being the people involved in the cited lawsuits.  (See Doc. 270 at 8).  Although

the Court certainly cannot consider a newspaper article outside the record as evidence, it

also cannot base the identity of a juror-litigant on Defendants' bald assertion with the listing

of a case number.

Second, even assuming that these three jurors were the persons involved in the "prior

litigation" noted by Defendants, Defendants cannot meet their burden on either of the

McDonough prongs.  The Court asked the venire during voir dire:  "Have any of you been

a party to a civil lawsuit other than a family related matter such as a dissolution of marriage

or an adoption?  And you obviously have as an attorney, but have you, have any of you been

parties to a lawsuit?  Related to your work?"  (Trial Tr. Feb. 11, 2008, Doc. 237, at 89-90).

Four of the six lawsuits cited by Defendants involved promissory notes or real estate

evictions; the other two are described by Defendants as "personal injury cases" and by

Plaintiff as "automobile negligence" suits.  It is far from clear that a venire member would

deem such a case responsive to the court's inquiry.  Moreover, the venire was further asked

whether any of them had been a witness in a court proceeding.  (Id. at 90).  When one panel

member answered that he had been a witness, the Court made further inquiry and asked if

the panel member understood that this case was a different kind of proceeding and was

completely unrelated, to clarify whether the prior experience would affect jury service in this

case; the panel member said no.  (Id. at 90-91).  If the three panel members at issue here had disclosed prior case involvement, the Court would have similarly inquired, but Defendants' assertion that such questioning would have led to their disqualification is nothing but speculation.

With regard to the second, "actual bias" prong of McDonough, Defendants also fall far short of meeting their burden.  "Actual bias may be shown in two ways:  'by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed.'"  Perkins, 748 F.2d at 1532 (quoting United States v. Nell, 526 F.2d 1223, 1229 (5th Cir. 1976)).  Certainly there are no "express admissions" of bias here, and there also has been no proof of a "close connection—or a connection of any kind—to the circumstances of this case such that bias by any of these three jurors could be presumed.

Amazingly, regardless of what side a juror allegedly was on in the prior lawsuits, bias in favor of Plaintiff is, according to Defendants, indicated.  (See Doc. 253 at 5 (stating that the personal injury/automobile negligence juror "could be expected to be extremely sympathetic to [Plaintiff] considering that both . . . sought recovery for pain and suffering" and that the other two jurors "could both be expected to be extremely sympathetic to [Plaintiff] considering [that the three] were all defendants in suits to recover money"[21])).  Defendants then make the leap that the alleged bias "has been borne out by the result"

---

[21]On this second point, Defendants are apparently referring to the fact that Defendants sued Plaintiff to recover money in another case, after which Plaintiff decided to file the instant lawsuit against them.  Defendants overlook the fact that in this lawsuit they are the ones who are the defendants in a "suit to recover money."

because "[o]nly a jury made up of people who were less than forthright could award [Plaintiff] such a staggering sum of compensatory and punitive damages." (Doc. 253 at 5). Defendants' speculation and impassioned rhetoric, however, do not satisfy <u>McDonough</u>. They are not entitled to a new trial based on the jurors' voir dire responses.

In sum, Defendants' assertions that these jurors were dishonest and that a new trial is therefore warranted are totally devoid of merit.

B.  Defendants' Motion for Entry of Judgment (Doc. 268)

The judgment that was entered by the Clerk on February 29, 2008 provides that Plaintiff shall recover from the Defendants the amounts found by the jury on her battery claims; the judgment does not mention the sexual harassment claims.  Citing Federal Rule of Civil Procedure 58(d), Defendants now seek entry of judgment in their favor pursuant to the jury's verdict on Plaintiff's sexual harassment claims under Title VII and the FCRA. (<u>See</u> Doc. 268).  Plaintiff opposes this motion. (<u>See</u> Doc. 273).  In these filings, the parties again argue about the timeliness of the Title VII claim; this issue has already been addressed herein.

The Court will direct the entry of a more specific judgment.  In light of the other rulings in this Order, the original judgment must already be vacated and a new one entered in its stead; the Court will direct entry of a judgment addressing all claims.  Defendants' Motion for Entry of Judgment (Doc. 268) is thus granted to the extent that all claims will be addressed in the amended judgment.

C.  Defendants' Objections and Motion to Strike Costs (Doc. 260)

The final motion pending before the Court is Defendants' Objections and Motion to

Strike Costs Sought in Plaintiff's Bill of Costs (Doc. 260).  This motion will be referred to the assigned magistrate judge for resolution in accordance with the Court's usual practice for such motions.

> III.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.  Defendants' Unopposed Motion to Seal (Doc. 245) is **DENIED as moot**.

2.  Defendants' Motion for Remittitur (Doc. 252) is **DENIED**.

3.  Defendants' Motion for New Trial (Doc. 253) is **DENIED**.

4.  Defendants' Renewed Motion for Judgment as a Matter of Law (Doc. 254) is **GRANTED in part** and **DENIED in part**.  To the extent the motion seeks reduction of the amount of punitive damages to the maximum under Florida law, the motion is **GRANTED** and an amended judgment will be entered accordingly.  In all other respects, the motion is **DENIED**.

5.  Defendants' Request for Oral Argument (Doc. 255) is **DENIED**.

6.  Plaintiff's Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50 on Statute of Limitations (Doc. 257) is **DENIED**.

7.  Plaintiff's Motion to Establish Entitlement to Fees Under Title VII and Florida Civil Rights Act (Doc. 258) is **DENIED**.

8.  Defendants' Objections and Motion to Strike Costs Sought in Plaintiff's Bill of Costs (Doc. 260) is referred to the assigned magistrate judge.

9.  Defendants' Motion for Entry of Judgment (Doc. 268) is **GRANTED**.

10.  Plaintiff's Motion for Remand of Certain State Claims (Doc. 280) is **DENIED**.

12.   Plaintiff's Motion to Vacate Stay and Require Bond (Doc. 285) is **DENIED without prejudice**.

13.  Defendants' second Unopposed Motion to Seal (Doc. 286) is **DENIED as moot.**

14.  The judgment entered on February 29, 2008 (Doc. 241) is hereby **VACATED**. The Clerk is directed to enter an amended judgment providing that in accordance with the jury's verdict and this Order, Plaintiff shall take nothing from Defendants on her claims under Title VII or the Florida Civil Rights Act and that on her battery claim Plaintiff shall recover from the Defendants $103,622.09 in compensatory damages, as well as $506,847.75 in punitive damages, for a total award of $610,469.84.[22]

**DONE** and **ORDERED** in Orlando, Florida this 23rd day of October, 2008.

_____
JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party

---

[22]The amounts to be included in the amended judgment have been computed by adding interest at the statutory interest rate provided for in 28 U.S.C. § 1961(a) from the date of the jury's verdict.  The jury's verdict was returned on February 20, 2008, and the statutory interest rate for the week ending February 15, 2008 was 2.04%.  See 28 U.S.C. § 1961(a) (providing that the rate for the preceding calendar week shall be used).  Thus, the Court has added $1398.95 in interest to the compensatory damages award and $6847.75 in interest to the punitive damages award to account for the passage of time from the date of the verdict to the date of entry of this Order and the amended judgment.